# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### EVANSVILLE DIVISION

| | | |
|---|---|---|
| ROY LEE WARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | Case No. 3:12-cv-00192-RLY-WGH |
| | ) | |
| BILL WILSON, Superintendent, | ) | |
| | ) | |
| Respondent. | ) | |

## Entry Discussing Petition for Writ of Habeas Corpus

Roy Ward, a state prisoner, challenges the validity of his conviction and sentence through his petition for writ of habeas corpus. For the reasons explained in this Entry, the petition of Roy Ward for a writ of habeas corpus must be **denied** and the action dismissed with prejudice.

## I. Applicable Law

"[I]n all habeas corpus proceedings under 28 U.S.C. § 2254, the successful petitioner must demonstrate that he 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Brown v. Watters,* 599 F.3d 602, 611 (7th Cir. 2010) (quoting 28 U.S.C. § 2254(a)). Ward's petition is governed by provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA

> amended 28 U.S.C. § 2254(d) to narrow the power of federal courts to grant habeas corpus relief to state prisoners. Under that Act, the critical question on the merits of most habeas corpus petitions shifted from whether the petitioner was in custody in violation of the Constitution, laws, or treaties of the United States to a much narrower question: whether the decision of the state court keeping the petitioner in custody was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d).

*Avila v. Richardson*, 751 F.3d 534, 535 (7th Cir. 2014).

> A decision is contrary to clearly established federal law if the state court applies a rule that conflicts with a rule identified by the Supreme Court, or if the state court reaches a different conclusion than the Supreme Court in a case with materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000). A decision involves an unreasonable application of clearly established law if the state court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S. Ct. 1495. Under both tests, mere error is not sufficient; a state court's decision must be "objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 76, 123 S. Ct. 1166, 155 L.Ed.2d 144 (2003).

*Simonson v. Hepp*, 549 F.3d 1101, 1105-06 (7th Cir. 2008).

As explained by the Supreme Court, the AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 412 (2000); *see also Miller–El v. Cockrell,* 537 U.S. 322, 337 (2003) ("Statutes such as AEDPA have placed more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state prisoners."). "The petitioner carries the burden of proof," *Cullen v. Pinholster,* 131 S. Ct. 1388, 1398 (2011)—a burden the Court of Appeals has recently characterized as "daunting." *Kubsch v. Neal*, 2015 WL 4747942, at *36 (7th Cir. Aug. 12, 2015); *see also Sanchez v. Gilmore,* 189 F.3d 619, 623 (7th Cir. 1999)("A petitioner can also attack a state court's adjudication on the grounds that it is based 'on an unreasonable determination of the facts,' but such attacks are accompanied by a rigorous burden of proof: state court factual findings are presumed to be correct

2

unless the petitioner rebuts the presumption with 'clear and convincing' evidence. [28 U.S.C.] § 2254(e)(1) . . . .").

"For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Williams,* 529 U.S. at 410). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

The first step under § 2254(d)(1) is "to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." *Marshall v. Rodgers,* 133 S. Ct. 1446, 1449 (2013) (citing *Williams*, 529 U.S. at 412; *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). In proceeding with the analysis, a federal habeas court "must determine what arguments or theories supported, or, [in the case of an unexplained denial on the merits], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, 562 U.S. 86 (2011). If a state court's decision "was reasonable, it cannot be disturbed." *Hardy v. Cross*, 132 S. Ct. 490, 495 (2011) (per curiam). Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington,* 562 U.S. at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. "As a condition for obtaining habeas corpus from a federal court, a state prisoner

must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

## II. Background

Absent clear and convincing evidence to the contrary, the court presumes the state court's factual determinations to be correct. 28 U.S.C. § 2254(e)(1); *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003). "In § 2254 proceedings, federal courts are foreclosed from fact-finding. We therefore defer to the findings of the [state] court, which have not been challenged and are presumed to be correct unless rebutted by clear and convincing evidence." *Jones v. Butler,* 778 F.3d 575, 578 (7th Cir. 2015)(citing 28 U.S.C. § 2254(e)(1) and *Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012)).

### A.  The Crime

The evening of July 10, 2001, ended for the family of Roger and Julie Payne and their three children--Melissa, Stacy and Brian--as might have been expected for them in early summer. Julie Payne and Stacy Payne, age 15, attended the softball game of Melissa Payne, who was age 14. They arrived home at around 10:00 p.m. Stacy and Melissa changed clothes and went to bed in a room they shared.

On the morning of July 11, 2001, Roger and Brian awoke early and left for work. Julie also had to work that morning. After Roger and Brian left, Julie checked on Stacy and Melissa through the bedroom door and saw them lying asleep on the bedroom floor, as was their habit in the summer. Julie then left for work.

On that morning, Melissa awoke at 8:30 a.m., and Stacy awoke about 30 minutes later. When Melissa woke up, she went downstairs, watched some television, and went on the Internet

to chat with friends via Yahoo Messenger. Then, at about 10:00 a.m., Melissa went outside to feed, water, and play with the family's Miniature Schnauzer. Afterwards, Melissa came back inside, watched more television, and at approximately noon went back upstairs to take a nap. Melissa saw Stacy on the telephone, on the Internet, and watching television that morning as well. Stacy was scheduled to work at Jenk's Pizza later that afternoon.

Pretending he was searching for a lost dog, Ward convinced Stacy to let him into the house. Melissa, who was upstairs sleeping, woke up to the sounds of Stacy's screams. Hearing the screams, Melissa came out of the bedroom, went to the top of the stairs and looked down. She saw Stacy on the ground with a man on top of her. Stacy was screaming. Melissa saw her sister and the man struggling. The man was holding Stacy down and hitting her.

Melissa went to her parents' room and dialed 911. Stacy was still screaming while Melissa was on the telephone. As she was screaming, Stacy pleaded with the man to "please stop, please stop," to which he responded, "you better be quiet." Police arrived within 10 minutes of Melissa's phone call.

Dale Town Marshal Matt Keller arrived first. Keller saw a black Pontiac Bonneville with Perry County plates parked at the residence. Keller then entered the house and saw Ward standing five to six feet from the door with a closed-blade knife in his hand and sweating. Ward dropped the knife when commanded to do so and went to the floor after Keller's second command to do so. Ward was handcuffed and taken into custody.

Keller contacted dispatch, informing them that he "had one in custody."  He then moved Ward outside, took a couple of steps inside the home, and saw Stacy lying in a huge pool of blood in the kitchen area.

Stacy was nude from the waist down, with her abdominal contents "outside of her body." She was flailing her arms and legs and trying to speak. Keller positioned himself so that he could keep an eye on Ward and keep watch over Stacy while he waited for an ambulance.

Deputy Sheriff Dale Kessinger arrived at approximately the same time as the dispatched Emergency Medical Services crew. Ward was placed in Marshal Keller's car. Ward's front pocket contained a white piece of twine evidencing a red stain. The twine had blond hair wrapped up in it. Meanwhile, 911 operator, Dara Harris, had kept Melissa on the telephone as Keller had entered the Payne residence. Operator Harris could hear Stacy screaming in the background while she spoke with Melissa.  Operator Harris told Melissa that a man had been apprehended, and that an officer was coming up the steps to assist her. Detective Randy Cutrell then took Melissa out of the house and placed her into a police car. Melissa did not see Stacy nor Ward as she exited the house, but she did see an unfamiliar black car in the driveway.

When Emergency Medical Technician ("EMT") Murray Stout approached Stacy at the scene to render emergency services, Stacy initially threw her arm at him several times as if she were trying to fight him off. At the same time, she was moving her legs as if she were trying to crawl. EMT Stout, concerned from this behavior that Stacy may have mistaken him as her attacker, explained to Stacy that he was there to help. Stout tried to place Stacy's abdominal contents back inside her body through the use of wound dressings. While Stout and his partner attended to Stacy, she would open her eyes from time to time and she cried several times. Stacy grimaced and moaned with pain as the EMTs moved her. Stacy was able to nod in response to questions from Stout. Stacy was placed in the ambulance. Stout's partner called for an emergency ambulance because the EMTs had determined that the local hospital did not have the capacity to deal with wounds of the severity inflicted upon Stacy.

EMTs tried to place a nasal airway in Stacy, but it caused her to gag. They then implemented a non-rebreather mask to provide Stacy with oxygen. Because Ward had cut Stacy's throat and trachea open, EMTs had to wrap a plastic IV bag wrapper around Stacy's neck to enable her to breath. Stacy remained conscious throughout all of these efforts. The EMTs were with Stacy for nine minutes at the Payne home, and for an additional 10 minutes in transport to the hospital.

Upon arrival at St. Joseph's Hospital, Stacy was presented to emergency medicine physician Dr. Rodney Edwards. Stacy was prepared for transportation by helicopter to Louisville Hospital, which is a Level One trauma center. Stacy remained at St. Joseph's for approximately 46 minutes before being air-lifted to the University of Louisville Hospital.

Stacy's small intestines were outside of the abdominal cavity, and as she was lying on the backboard with her abdomen up, Dr. Edwards could see that the opening of her abdomen was "all the way from one side to the other." Upon closer inspection, it was revealed that the wound to Stacy's abdomen--a 24½ inch circumferential laceration around her waist--left only about five inches of her midsection unsevered. The backbone was exposed by this wound, which indicated to Dr. Edwards that there had been multiple attempts to cut through Stacy's spine. Stacy also had a large gaping wound across her neck that revealed the back wall of her windpipe. Stacy also had an incision across her left hand that exposed bone.

While Stacy was being treated at the emergency room, a nurse instructed her to squeeze her hand if she could understand, and Stacy did so. After Stacy arrived at the University of Louisville Hospital, she was transported to the major resuscitation room where medical personnel tried in vain to save her life. Stacy was pronounced dead at 5:20 p.m. Eastern Time, on July 11, 2001, approximately five hours after the attack.

**B.  Proceedings in the Indiana State Courts**

On July 16, 2001, the State charged Ward with murder, and subsequently filed a notice of intent to seek the death penalty. Thereafter, the State filed an amended information to include one count of rape as a Class A felony and one count of criminal deviate conduct as a Class A felony. The State sought the death penalty based on four aggravating factors: (1) the defendant committed the murder by intentionally killing the victim while committing rape; (2) the defendant committed the murder by intentionally killing the victim while committing criminal deviant conduct; (3) the defendant committed the murder while on probation for committing a felony; and (4) the victim was mutilated or tortured while still alive.

On February 8, 2002, Ward filed a motion for change of venue from the county, or in the alternative a motion to draw the jury from another county pursuant to IND.CODE § 35-36-6-11. Ward was ultimately unsuccessful in obtaining a change of venue, and the matter was tried before a Spencer County jury. The jury convicted Ward as charged.

The penalty phase of trial began October 21, 2002, and the jury returned a recommendation of death. Following a sentencing hearing, the trial court followed the jury's recommendation. The trial court also sentenced Ward to two consecutive fifty-year terms of imprisonment for the rape and criminal deviate conduct convictions.

The foregoing events are chronicled in Ward's direct appeal. *Ward v. State*, 810 N.E.2d 1042 (Ind. 2002)("*Ward I*"). In *Ward I,* Ward's convictions and death sentence were reversed based on the Indiana Supreme Court's finding that Ward's constitutional right to a fair trial was violated when the trial court failed to grant Ward a change of venue.

On remand, Ward sought and obtained a new judge. The Honorable Robert J. Pigman was selected. Following Ward's request for a change of venue from Spencer County, the parties agreed to select the jury from Clay County, with the trial to be held in Judge Pigman's Vanderburgh

County courtroom. The State proceeded on murder and rape charges, to which Ward pleaded

guilty. After a new penalty phase, a jury recommended Ward be sentenced to death. The trial court

accepted that recommendation and sentenced Ward to death on June 8, 2007.

On April 7, 2009, the Indiana Supreme Court affirmed Ward's death sentence. *Ward v.
State,* 903 N.E.2d 946 (Ind. 2009)*(Ward II)*, *aff'd on reh'g*, *Ward v. State,* 908 N.E.2d 595 (Ind.
2009)*(Ward III)*, *cert. denied sub nom, Ward v. Indiana,* 130 S. Ct. 2060 (2010). In writing for the

Indiana Supreme Court, Justice Dickson explained:

> Jury selection in this case arose under unconventional circumstances. Guilt was not
> at issue. The defendant pleaded guilty to Murder and Rape, class A felonies. Under
> the plea agreement, the court would determine the sentence for the Rape conviction,
> but the defendant reserved the right to a penalty phase jury trial on the State's
> request for the death sentence. At the penalty phase trial, the State sought the death
> penalty asserting three statutory aggravating circumstances: (1) the defendant
> committed the murder by intentionally killing the victim while committing rape,
> (2) the defendant committed the murder while on probation for committing a
> felony, and (3) the victim was mutilated or tortured while still alive. Appellant's
> App'x at 1055. The issues before the penalty phase jury were whether one or more
> of these aggravating circumstances was proven beyond a reasonable doubt; if so,
> whether any mitigating circumstances that exist were outweighed by the
> aggravating circumstances appropriate for consideration; and, if so, whether to
> recommend a death sentence, life without parole, or a term of years. Ind.Code §
> 35–50–2–9(e).

*Ward II,* 903 N.E.2d at 953-54 (footnotes omitted).

Ward sought post-conviction relief, which was denied on November 10, 2010, after an

evidentiary hearing. The denial of post-conviction relief was affirmed on appeal in *Ward v. State,*

969 N.E.2d 46 (Ind. 2012)*(Ward IV)*, *reh'g denied* 2012 Ind. LEXIS 764 (Sept. 7, 2012).

### III. The Habeas Claims

Ward presents ten claims in his petition for writ of habeas corpus. These claims

are as follows.

I.     TRIAL COUNSEL'S INADEQUATE PENALTY PHASE INVESTIGATION
       RESULTED IN A LIMITED, DISTORED, AND PREJUDICIAL PORTRAYAL OF

WARD, IN CONTRAVENTION OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS.

II.    TRIAL COUNSEL WERE RENDERED CONSTITUTIONALLY INEFFECTIVE BY THE TRIAL COURT'S DENIAL OF A NECESSARY CONTINUANCE TO PREPARE FOR THE PENALTY PHASE OF THE TRIAL.

III.    TRIAL COUNSEL'S FAILURE TO CHALLENGE THE STATE'S FALSE TESTIMONY CONCERNING PRISON CONDITIONS OF CONFINEMENT DENIED WARD HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

IV.    TRIAL COUNSEL WERE RENDERED CONSTITUTIONALLY INEFFECTIVE BY THE TRIAL COURT'S DENIAL OF MOTIONS FOR ESSENTIAL EXPERT ASSISTANCE, AND BY THE TRIAL COURT'S DECISION TO CHANGE THE METHOD OF JURY SELECTION.  FURTHER, TRIAL COUNSEL'S FAILURE TO CHALLENGE THE STATE'S EVIDENCE OF CRIMINAL DEVIATE CONDUCT, AND VICTIM IMPACT DENIED WARD HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

V.    THE TRIAL COURT'S REPEATED REFUSAL TO REMOVE BIASED JURORS FOR CAUSE AND OVERALL CONDUCT OF VOIR DIRE IN THE CASE DEPRIVED WARD OF HIS RIGHT TO DUE PROCESS OF LAW. MOREOVER, AT LEAST ONE BIASED JUROR WHO SHOULD HAVE BEEN STRUCK FOR CAUSE REMAINED ON THE JURY, IN VIOLATION OF WARD'S RIGHT TO A FAIR AND IMPARTIAL JURY.

VI.    THE MUTILATION AGGRAVATING FACTOR IS UNCONSTITUTIONALLY OVERBROAD AND HAS NO CONSTITUTIONALLY REQUIRED NARROWING FUNCTION.

VII.    THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE TORTURE OR MUTILATION AGGRAVATING FACTOR.

VIII.    INDIANA'S DEATH PENALTY STATUTE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED IN THIS CASE.

IX.    THE ADMISSION OF GRUESOME PHOTOGRAPHS AT TRIAL VIOLATED WARD'S RIGHTS UNDER THE 5TH AND 14TH AMENDEMENTS.

X.    THE PROSECUTOR PRESENTED EVIDENCE AND ARGUMENT CONCERNING CONDITIONS OF CONFINEMENT AT THE INDIANA STATE

PRISON THAT HE KNEW OR SHOULD HAVE KNOWN WERE FALSE IN VIOLATION OF WARD'S RIGHT TO DUE PROCESS OF LAW.

## IV. Discussion

### A. Claims I through IV--Ineffective Assistance of Counsel (*Strickland*)

The first four claims in Ward's habeas petition are specifications of his claim of ineffective assistance of counsel. These specifications are that his attorneys (1) made an inadequate penalty phase investigation, (2) were rendered constitutionally ineffective by the denial of a continuance to prepare for the penalty phase, (3) failed to challenge false testimony offered by the State concerning prison conditions, and (4) were rendered constitutionally ineffective by the trial court's denial of motions for essential expert assistance and by the trial court's decision to change the method of jury selection. A part of this fourth specification is that Ward's attorneys were ineffective in failing to challenge the State's evidence of criminal deviate conduct and victim impact and were ineffective in failing to challenge the State's testimony regarding a putt-putt golf course at the Indiana State Prison.

Ineffective assistance of counsel is a single claim, no matter the number of attorney errors it is based on. *See Peoples v. United States*, 403 F.3d 844, 847–48 (7th Cir. 2005); *Duarte v. United States*, 81 F.3d 75, 77 (7th Cir. 1996). "It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one." *Williams v. Lemmon,* 557 F.3d 534, 538 (7th Cir. 2009); *see also Balfour v. Haws,* 892 F.2d 556, 562–63 (7th Cir. 1989) (noting that for specific allegations of ineffective assistance courts must "weigh the overall quality of representation provided to the defendant" and not individual shortcomings). Ward's assertions of ineffective assistance of counsel do not track this imperative, meaning that he has focused on specific areas of what he argues are deficient performance and claims that they individually warrant habeas relief. The court analyzes these

"individual shortcomings," but does so having considered "the entire course of the defense." *Williams,* 557 F.3d at 538; *see also Payne v. Brown*, 662 F.3d 825, 829 (7th Cir. 2011)(citing *Williams*).

"The Sixth Amendment to the Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' U.S. CONST. amend. VI. This right to assistance of counsel encompasses the right to effective assistance of counsel." *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) *cert. denied,* 134 S. Ct. 2830 (2014)(citing *Watson v. Anglin,* 560 F.3d 687, 690 (7th Cir. 2009)).

*Strickland v. Washington,* 466 U.S. 668 (1984), provides the clearly established Federal law, as determined by the Supreme Court of the United States that governs Ward's claim of ineffective assistance of counsel.

> "Under *Strickland,* we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Padilla v. Kentucky,* 559 U.S. 356, 366 (2010) (quoting *Strickland, supra,* at 688, 694).

*Hinton v. Alabama,* 134 S. Ct. 1081, 1087-88 (2014)(parallel citations omitted).

To satisfy the first prong of the *Strickland* test, the petitioner must direct the Court to specific acts or omissions of his counsel. *Wyatt v. United States,* 574 F.3d 455, 458 (7th Cir. 2009)(citing *Coleman v. United States,* 318 F.3d 754, 758 (7th Cir. 2003)). The court must then consider whether in light of all of the circumstances counsel's performance was outside the wide range of professionally competent assistance. *Id.* The court's review of counsel's performance must be "highly deferential[,] . . . indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689; *accord, Groves v. United States,* 755 F.3d 588, 591 (7th Cir.) *cert. denied,* 135 S. Ct. 501 (2014) *reh'g denied*, 135 S. Ct. 1038 (2015). Counsel's performance must be evaluated keeping in mind that an attorney's

trial strategies are a matter of professional judgment and often turn on facts not contained in the trial record. *Strickland,* 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The court cannot become a "Monday morning quarterback." *Harris v. Reed,* 894 F.2d 871, 877 (7th Cir. 1990).

The Supreme Court has recognized that there are "'countless ways to provide effective assistance in any given case'" and that "'[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *Harrington,* 562 U.S. at 106 (quoting *Strickland,* 466 U.S. at 689). It is therefore of no moment that, as a witness in the post-conviction relief proceedings, Ward's principal trial counsel was quite critical of her performance at the penalty phase.

> Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, [*Wiggins v. Smith*, 539 U.S. 510, 526-27, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003)], neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S., at 688, 104 S. Ct. 2052.

*Harrington,* 562 U.S. at 109-110; *see also McAfee v. Thurmer,* 589 F.3d 353, 356 (7th Cir. 2009) (noting that attorney "reflection after the fact is irrelevant to the question of ineffective assistance of counsel"); *Chandler v. United States,* 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) (en banc)

("Because the standard is an objective one, that trial counsel . . . admits that his performance was deficient matters little.")).

To satisfy the second prong of the *Strickland* test, the plaintiff must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable. *Groves,* 755 F.3d at 591; *United States v. Jones,* 635 F.3d 909, 915 (7th Cir. 2011)(citing cases); *Adams v. Bertrand,* 453 F.3d 428, 435 (7th Cir. 2006). "A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome." *Id.* (citing *Strickland,* 466 U.S. at 694). "In assessing prejudice, courts 'must consider the totality of the evidence before the judge or jury.'" *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010) (quoting *Strickland*, 466 U.S. at 695).

In the capital sentencing context, to assess prejudice, a habeas court must determine whether "there is a reasonable probability that at least one juror would have struck a different balance" in weighing the evidence for and against sentencing the defendant to death. *Wiggins v. Smith,* 539 U.S. 510, 537 (2003). In determining whether a petitioner has carried his burden of showing that there is a reasonable probability that at least one juror would have declined to impose a death sentence if presented with certain suppressed evidence, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 534; *534; see also Sears v. Upton, 130 S. Ct. 3259, 3265–67 (2010) (per curiam); Porter v. McCollum, 558 U.S. 30, 41 (2009) (per curiam); Rompilla v. Beard, 545 U.S. 374, 393 (2005).* In making this determination, the court considers the strength of the State's case, the aggravating circumstances the jury found, the mitigating evidence defense counsel did present, and the additional mitigating evidence the defense might have presented. *See, e.g., Walker v. Gibson,* 228 F.3d 1217, 1234 (10th Cir. 2000), *cert. denied,* 533 U.S. 933 (2001).

The foregoing outlines the straightforward features of *Strickland's* two-prong test. In the context of the claims that Ward presents, however, AEDPA raises the bar. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington,* 562 U.S. at 105 (citing *Knowles v. Mirzayance,* 556 U.S. at 123). When the deferential AEDPA standard is applied to a *Strickland* claim, the following calculus emerges:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable--a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles,* 556 U.S. at 123)(internal citations and quotations omitted). The emphasis on deferential review could not be clearer:

> Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." This is especially true for claims of ineffective assistance of counsel, where AEDPA review must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt.

*Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)(citations and some quotations omitted).

Ward's first claim is that he is entitled to post-conviction relief because his trial counsel were ineffective in investigating, preparing, and presenting evidence in mitigation of the death penalty. Specifically, he argues that trial counsel (a) failed to conduct an adequate mitigation investigation; (b) failed to have him evaluated by appropriate mental health experts in a timely and comprehensive manner; (c) failed to present certain mitigation testimony from lay witnesses that were called at trial; and (d) failed to inform the jury that his guilty plea was a mitigating circumstance.

The Indiana Supreme Court recognized these separate specifications of ineffective assistance of counsel, which it described as "overlap[ping] to some degree." *Ward IV,* 969 N.E.2d

15

at 52. It reviewed in detail both the findings of the trial court in acting on the petition for post-conviction relief and the evidence at the post-conviction hearing. In doing so, it found the post-conviction findings of the trial court to be substantially justified in many respects. After detailing those findings and delineating the points on which it departed from the trial court in the proper evaluation of the evidence and the performance of counsel, the Indiana Supreme Court explained its findings and conclusions as to each of these specifications:

> [I]t is clear from the record here that trial counsel conducted a reasonable mitigation investigation. They interviewed Ward, his family members, and others who knew him to gain insight into his background and to develop his history; they also gathered records related to his education, his time in prison, and his mental health. Using the ABA standards as a guide, we think that the scope of counsel's investigation was reasonable. . . . *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 cmt. (rev. ed. 2003) (noting that among the topics counsel should explore are medical history, family and social history, religious and cultural influences, educational history, military service, employment and training history, and prior adult and juvenile correctional experience). . . . And although they may have wanted to uncover certain mitigating evidence or may have intended to interview one potential mitigation witness in particular, they were not constitutionally deficient for failing to do so on this record. Ward's trial counsel simply did not make "errors so serious that [they were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S. Ct. 2052.

*Ward IV*, 969 N.E.2d at 56-57 (internal citations and footnotes omitted).

Concerning Ward's claim that trial counsel were ineffective in selecting and preparing the mental health experts utilized at trial, the Indiana Supreme Court reviewed the strategy, the evidence at the penalty phase, and the evidence at the post-conviction hearing, including the mental health diagnoses and treatment modalities, and concluded:

> [A]lthough the evidence is not unequivocal as to Ward's total lack of remorse, there is a substantial amount of evidence to support the PC court's finding of a consensus among the experts that Ward lacks empathy for others and is motivated by his own interests. However, in addition to the one distinction noted by the PC court that the trial experts placed more emphasis on biology and the PC experts placed more emphasis on environment, we note a few others. Specifically, the trial experts, while diagnosing Ward with antisocial personality disorder, also labeled Ward as a

16

psychopath. The PC experts, although agreeing that Ward has antisocial personality disorder, did not refer to Ward as a psychopath and, in fact, stated that Ward could not be summed up by any sort of label. Moreover, while the trial experts testified that there was no real treatment for Ward at this time, at least one of the PC experts testified that Ward could be treated. Thus, we observe these differences in addition to the one noted by the PC court, but as discussed *infra,* we conclude that they do not affect the outcome. . . .

*Ward IV,* 969 N.E.2d at 64.

The Indiana Supreme Court used its authority to independently reweigh aggravating and mitigating circumstances to assure measured consistent application of the death penalty and assure fairness to the accused. *See Bellmore v. State*, 602 N.E.2d 111, 129 (Ind. 1992).

We sum up and weigh all the evidence as follows. On the mitigation side, we weigh the following evidence in the low-to-medium range: Ward had some issues in his upbringing and his family had some mental health problems, but he did not have a particularly nightmarish childhood like that in *Williams* or *Sears*; and he had some personality disorder (and, according to two mental health experts, the most severe type of antisocial personality disorder—psychopathy—through no fault of his own). We weigh the following evidence in the low range: There may have been missed opportunities to help Ward, and his family was not particularly supportive of positive behavior. His family testified that Ward should spend the rest of his life in prison and that his execution would impact them. There was also testimony presented that Ward could safely be housed in prison and may be treatable. Ward admitted to raping and murdering Stacy Payne and may have felt some remorse for it. Ward did some thoughtful things and had helped others in the past. Ward had ADHD and learning disabilities; he had a history of exhibitionism and some history of alcohol dependence; he had anxiety and depression; and he had poor coping skills and was facing certain stress factors around the time of the murder. All or some of these kept Ward from conforming his conduct to the law.

On the other side of the scale are the aggravating circumstances. We weigh in the low range the aggravating circumstance that Ward was on probation for felony burglary out of Missouri at the time he committed the murder. We weigh in the high range the aggravating circumstance that Ward committed the murder by intentionally killing Stacy Payne while committing or attempting to commit rape. We weigh in the highest range the aggravating circumstance that Ward tortured and mutilated Stacy Payne while she was alive. He tied her up. He hit her repeatedly, causing eighteen blunt force injuries to her body. He cut her hand to the bone. He cut her throat such that her windpipe and internal jugular vein were severed, preventing her from speaking and inhibiting her breathing. He nearly cut her body in half such that her intestines literally spilled out of her abdomen. She remained alive while he did this, attempting to fight him off: She was alive during the EMT

17

care at her house and during her transport to and care at the local hospital, where she was treated for 46 minutes and finally given a sedative, Trial II Tr. 1334, 1338–39. And she was pronounced dead after being air-lifted to the University of Louisville Hospital, roughly four hours after she was first attacked by Ward. *See id.* at 1285, 1350–51.

After weighing the totality of the mitigating evidence against the evidence in aggravation, we conclude that Ward was not prejudiced by any inadequacies in his trial counsel's performance discussed in this Part II. There is no reasonable probability that the additional evidence presented at the PC hearing would have changed the jury's verdict.

*Ward IV,* 969 N.E.2d at 71-72. The foregoing analysis shows that the Indiana Supreme Court "took the constitutional standard seriously and produced an answer within the range of defensible positions," *Mendiola v. Schomig,* 224 F.3d 589, 591 (7th Cir. 2000), fully cognizant that Ward's counsel had the obligation "to conduct a thorough investigation of [Ward's] background," *Williams,* 529 U.S. at 396, so as "to uncover and present . . . mitigating evidence" to the jury at sentencing. *Wiggins v. Smith,* 539 U.S. 510, 522 (2003). *See Ward IV,* 969 N.E.2d at 56 ("Although Ward's trial counsel failed to discover some arguably mitigating evidence, they nevertheless conducted a reasonable investigation, thereby passing constitutional muster.").

Ward has not shown the foregoing, to the extent it represents a statement of facts, to be an unreasonable determination of the facts. The state court findings of fact made in the course of deciding an ineffectiveness claim are questions of fact, subject to "a presumption of correctness." *Thompson v. Keohane,* 516 U.S. 99, 111 (1995); *Strickland,* 466 U.S. at 698 (federal habeas courts must defer to "state court findings of fact made in the course of deciding an ineffectiveness claim"); *Galowski v. Murphy,* 891 F.2d 629, 635 (7th Cir. 1989), *cert. denied,* 495 U.S. 921 (1990). In reviewing the penalty phase, the Indiana Supreme Court applied the appropriate standard and pointed to all the evidence which made that Court confident that the jury's recommendation was not affected by the asserted deficient representation by Ward's counsel.

18

Under AEDPA, "the ultimate question is 'whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard,' and we must deny the writ if the state court offered a reasonable argument that counsel behaved competently." *Carter v. Douma,* 2015 WL 4646664, at *5 (7th Cir. Aug. 6, 2015) (quoting *Harrington,* 562 U.S. at 105). To overcome the deference to which these conclusions are entitled, Ward's burden in this habeas action is "to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington,* 562 U.S. at 104 (citing *Strickland,* 466 U.S. at 687). Ward has not met that burden.

As to the second *Strickland* requirement, prejudice, and repeating from its discussion quoted above, the Indiana Supreme Court "conclude[d] that Ward was not prejudiced by any inadequacies in his trial counsel's performance [and] . . . There is no reasonable probability that the additional evidence presented at the PC hearing would have changed the jury's verdict." *Ward IV*, 969 N.E.2d at 72. In reviewing the penalty phase, the Indiana Supreme Court applied the appropriate standard and pointed to all the evidence which made that Court confident that the jury's recommendation was not affected by the asserted deficient representation by Ward's counsel. That was a fully reasonable application of *Strickland* and deserves the AEDPA deference which the federal habeas statute commands in such circumstances. *Preno v. Moore*, 131 S. Ct. 733, 745 (2011)("The state postconviction court reasonably could have concluded that [the defendant] was not prejudiced by counsel's actions. Under AEDPA, that finding ends federal review.").

### B. Claim IV--Ineffective Assistance of Counsel (*Cronic*)

Contending that there were circumstances which actually resulted in the *deprivation* of representation, Ward has assembled a second set of ineffective assistance of counsel specifications under the holding in *United States v. Cronic,* 466 U.S. 648 (1984). In *Cronic*, decided the same

day as *Strickland,* the Supreme Court held that there are situations where the ineffectiveness of counsel "is properly presumed without inquiry into actual performance at trial." *Id.* at 661. A presumption of prejudice is appropriate where (1) the accused is denied counsel at a critical stage of the trial, (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, or (3) although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is small under the circumstances. *Id.* at 659–60; *Bell v. Cone,* 535 U.S. 685, 695–96 (2002). The Supreme Court has described *Cronic* as a "narrow exception" to *Strickland* that should be applied "infrequently." *Florida v. Nixon,* 543 U.S. 175, 190 (2004). To successfully invoke the presumption of prejudice, counsel's "failure must be complete." *Wright v. Van Patten,* 552 U.S. 120, 124 n.1 (2008); *Bell,* 535 U.S. at 697; *Smith v. Brown,* 764 F.3d 790, 796 (7th Cir. 2014). It has been held that *Cronic* describes merely a subset within the universe of *Strickland* claims that includes "the most extreme instances of lawyerly incompetence." *Barrow v. Uchtman,* 398 F.3d 597, 603 n.4 (7th Cir. 2005). By the same token, however, the difference between a *Strickland* claim and a *Cronic* claim "is not of degree but of kind." *Bell,* 535 U.S. at  697. Ward presented claims based on *Cronic* and that is how the Indiana Supreme Court addressed them. This court does likewise.

The third *Cronic* exception applies where "counsel [was] called upon to render assistance under circumstances where competent counsel very likely could not." *Bell,* 535 U.S. at 696. That is the exception implicated by Ward's *Cronic* arguments in this case. Those arguments are that the trial court committed error by: (a) denying a continuance; (b) denying funds for essential experts; and (c) altering the method of jury selection.

The Indiana Supreme Court first properly recognized *Cronic* as the controlling Supreme Court authority and the three narrow circumstances in which the *Cronic* standard applies. *Ward IV,* 969 N.E.2d at 77.

> In examining these claims, we look for circumstances that justif[y] a presumption that no lawyer could provide Ward with the effective assistance of counsel required by the Constitution. In other words, for us to presume prejudice under *Cronic,* it must be shown that the circumstances completely deprived Ward of any meaningful opportunity to subject the State's evidence to adversarial testing.

*Id.* (internal quotations and citations omitted). "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy,* 461 U.S. 1, 11–12 (1983) (citation omitted).

The first *Cronic* specification Ward presented was the trial court's denial of a continuance to permit counsel more time to complete the investigation necessary for the presentation of mitigation evidence. The Indiana Supreme Court reviewed the passage of time between the remand and the penalty phase hearing, reviewed the investigation/mitigation resources available to Ward, and also compared the evidence at the penalty phase with that proffered at the post-conviction hearing. Its application of the *Cronic* standard to these circumstances was this:

> The circumstances surrounding the trial court's refusal to continue Ward's second trial fall far far short of justifying a presumption that no lawyer could provide Ward with the effective assistance of counsel required by the Constitution or of showing that he was completely deprived of a meaningful opportunity to subject the State's case to adversarial testing. *See Cronic,* 466 U.S. at 661, 104 S. Ct. 2039 (not every refusal to continue a trial gives rise to a presumption of prejudice). As discussed above, Ward's counsel had roughly eighteen months in total to prepare for trial, and they had at least four months to prepare from the time Judge Pigman set the May, 2007, trial date. They had access to a variety of resources, including knowledge of everything presented in Ward's first trial, and had obtained or were in the process of obtaining various sources of mitigating evidence. We do not reach a conclusion opposite the PC court that Ward's trial counsel were not rendered ineffective by the trial court's refusal to grant a continuance.

*Ward IV,* 969 N.E.2d at 79.

Ward's second *Cronic* specification of ineffective assistance of counsel is that the trial court committed error by denying requested funds for necessary mental health experts. Specifically, he references experts in special education and sex-offender treatment. The Indiana Supreme Court considered what Ward's counsel had to work with.

> Although trial counsel were not granted funds to retain an expert in sex-offender treatment or in special education, they were granted funds to retain two mental health experts, Dr. Friedman and Dr. Parker. They also had at their disposal all of the expert testimony presented in the first trial for both the State and the defense, including one expert who specialized in sexology or sexual dysfunction. Trial I Tr. 2407–09. And they were in the process of contacting a mental health professional who had actually treated Ward for his exhibitionism. *See* Trial II App. 513 (referring to Life Springs health care provider who had treated Ward for a year). Finally, trial counsel also had access to or were in the process of obtaining Ward's school records, which clearly indicated that Ward had a learning disability, and had interviewed or were in the process of interviewing people who could testify to Ward's formative years, including his education.

> We do not reach a conclusion opposite the PC court that Ward's trial counsel were not rendered ineffective by the trial court's refusal to grant funds to obtain certain expert assistance (considered individually and together with his argument regarding the continuance).

*Ward IV,* 969 N.E.2d at 79-80.

The Indiana Supreme Court's conclusions as to these first two *Cronic*-based specifications were reasonable. They each demonstrated that the Indiana Supreme Court understood and applied the correct constitutional standard, and neither "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" nor "resulted in a decision that was based on an unreasonable determination of the facts."

Ward's third *Cronic*-based claim is his argument that the trial court's sudden change from individual to group *voir dire* did not permit his counsel the forum needed to reveal potential jurors' biases about the sentence someone charged with a crime like his should receive.

The Indiana Supreme Court rejected the Ward's argument on direct appeal following the remand that the trial court committed reversible error by modifying the format of *voir dire* from individual to group questioning of prospective jurors. The description and evaluation of this claim was as follows:

> Two days before the trial began, the trial judge informed counsel that, in light of the broadcast publicity regarding unidentified "events of last week," the questioning of prospective jurors regarding the death penalty and publicity would be done individually, away from other prospective jurors. But the trial judge quickly recognized that "[a]t the rate we[']re going, it will be months, not days, before we get a jury picked," Tr. at 528, and modified that plan following lunch recess on the first day of voir dire. The court explained that henceforth the "only individual voir dire will be on the issue of pretrial publicity" and that "everybody else will be voir dired together on the death penalty questions." *Id.* This new procedure was then implemented despite the defense's general objection "on due process grounds." *Id.* at 529.
>
> Other than his general trial objection to the judge's change in format, however, the defendant does not identify any particular objection made during the ensuing voir dire asserting improper exposure of prospective jurors to prejudicial statements. He does not assert on appeal any claim that specific jurors were permitted to serve following a trial court failure to grant a defense challenge for cause arising out of any such incidents.
>
> A trial court has broad discretionary power to regulate the form and substance of voir dire. *Kalady v. State,* 462 N.E.2d 1299, 1307 (Ind. 1984). Individually sequestered voir dire is not mandated in any case under Indiana law, including capital cases, absent highly unusual or potentially damaging circumstances. *Holmes v. State,* 671 N.E.2d 841, 854 (Ind. 1996), *cert. denied,* 522 U.S. 849, 118 S. Ct. 137, 139 L.Ed.2d 85 (1997); *Brown v. State,* 563 N.E.2d 103, 105–06 (Ind. 1990); *Lowery v. State,* 547 N.E.2d 1046, 1049 (Ind. 1989), *cert. denied,* 498 U.S. 881, 111 S. Ct. 217, 112 L.Ed.2d 176 (1990). The trial court may structure voir dire to meet discrete circumstances, but does not abuse its discretion in managing voir dire if the defense fails to bring such discrete circumstances to the court's attention. *Holmes,* 671 N.E.2d at 854.
>
> The defendant has not established reversible error in the trial court's modification of the format for questioning potential jurors in this case.

*Ward II,* 903 N.E.2d at 955–56. This was not an unreasonable application of controlling Supreme

Court authority. *Silva v. Roden,* 2014 U.S. Dist. LEXIS 138256, at *41 (D.Mass. Sept. 29, 2014);

*United States v. Boyd*, 2008 WL 927765, at *1 (E.D.Tenn. Apr. 4, 2008)(citing *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)).

In addressing Ward's third *Cronic*-based claim, the Indiana Supreme Court noted its prior consideration and rejection of asserted error in the underlying event and refused to consider it further.

> Thus, while framed in a slightly different manner here, we have already decided this issue and, therefore, it is barred by *res judicata. See Pruit [*v. State, 903 N.E.2d 899, 905 (Ind. 2009)] (issues litigated adversely to the defendant on direct appeal are *res judicata*).

*Ward IV,* 969 N.E.2d at 80.

The Indiana Supreme Court's *res judicata* holding was proper. As explained in *Kubsch v. Neal*, 2015 WL 4747942, at *22 (7th Cir. Aug. 12, 2015), "[a] post-conviction petitioner cannot avoid claim preclusion by merely repackaging an earlier claim.")(citing *Reed v. State,* 856 N.E.2d 1189, 1194 (Ind. 2006)).

Ward is therefore not entitled to habeas relief based on his claim that the unanticipated change in the *voir dire* format deprived him of representation.

### C. Claim V— Conduct of *Voir Dire* and Refusal to Remove Jurors

Ward next claims that the manner in which the *voir dire* was conducted was insufficient to insure a fair and impartial jury. He argues that the resolution of this claim in *Ward II* was contrary to, or an unreasonable application of clearly established federal law, and based on an unreasonable determination of the facts. "A state court decision is contrary to clearly established federal law if the court applies a rule that plainly contradicts the Supreme Court's governing rule or if it comes to a result different than did the Supreme Court on substantially identical facts." *Avila v. Richardson,* 751 F.3d 534, 536 (7th Cir. 2014) (citing *Williams v. Taylor,* 529 U.S. 362, 405–06 (2000)). "A decision involves an 'unreasonable application' of Supreme Court precedent if the

24

decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Bailey v. Lemke,* 735 F.3d 945, 949 (7th Cir. 2013) (citing *Williams,* 529 U.S. at 407).

This court disagrees with Ward's contention that the Indiana Supreme Court made a decision based on an unreasonable determination of the facts. The court likewise disagrees with Ward that the Indiana Supreme Court reached a decision contrary to clearly established federal law. This leaves for consideration whether the Indiana Supreme Court reached a decision which was an unreasonable application of clearly established federal law.

The Sixth Amendment guarantees a criminal defendant the right to an impartial jury. The Due Process Clause independently requires the impartiality of any jury empaneled to try a case. *Morgan v. Illinois,* 504 U.S. 719, 726 (1992). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217 (1982).

The Supreme Court has held that "[a]ny claim that the jury was not impartial . . . must focus not on [the juror who was stricken], but on the jurors who ultimately sat." *Ross v. Oklahoma,* 487 U.S. 81, 86 (1988). A request to excuse a juror for cause "must be supported by specified causes or reasons that demonstrate that, as a matter of law, the [juror] is not qualified to serve." *Gray v. Mississippi,* 481 U.S. 648, 653 n.3 (1987).

> Jurors are considered impartial as long as they can "conscientiously and properly carry out their sworn duty to apply the law to the facts of a particular case." *Ross v. Oklahoma,* 487 U.S. 81, 86, 108 S. Ct. 2273, 101 L.Ed.2d 80 (1988). A request to excuse a juror for cause "must be supported by specified causes or reasons that demonstrate that, as a matter of law, the [juror] is not qualified to serve." *Gray v. Mississippi,* 481 U.S. 648, 653 n. 3, 107 S. Ct. 2045, 95 L.Ed.2d 622 (1987). The decision whether to exclude a juror for cause is vested in the trial court. *Id.* In certain circumstances juror bias will be presumed and the juror must be excluded, for example, where the juror is related to one of the parties or has a financial interest in the outcome of the case. *United States v. Polichemi,* 219 F.3d 698, 704 (7th

Cir.2000). However, juror bias will be presumed in only extreme cases. *See Smith,* 455 U.S. at 217-18, 102 S. Ct. 940.

*U.S. ex rel. Keller v. McCann,* 553 F. Supp. 2d 1002, 1015 (N.D.Ill. 2008).

The Indiana Supreme Court recognized the controlling authority in *Ross*. *Ward II,* 903 N.E.2d at 954-55. Ward's use of peremptory challenges to remove prospective jurors who the trial court had refused to remove for cause and his resulting inability to use his peremptory challenges on other prospective jurors did not deprive him of an impartial jury. The Indiana Supreme Court's decision to this effect was both a reasonable and a correct application of clearly established federal law. *Anderson v. Benik*, 2006 WL 208839, at *14 (W.D.Wis. Jan. 26, 2006).

Turning from the jury selection process to the jury which was actually selected, "[i]f even one" juror who would automatically vote for a death sentence "is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan v. Illinois,* 504 U.S. 719, 729 (1992). Ward claims that Juror 105 was such a juror and that this invalidates his death sentence. *Ward III,* 908 N.E.2d at 596 ("We now understand that the defendant sought in his appeal not only to assert error in his loss of preemptory challenges due to the trial court's denial of his challenges for cause, but also specifically to claim error in denying the for-cause challenge to Juror 105 and in permitting him to remain on the jury.").

As the Indiana Supreme Court found after a careful examination of the answers this juror supplied to various questions about his ability to keep an open mind, to consider the evidence, and to follow the instructions of the court concerning the law, the trial court did not commit error in permitting him to serve on the jury. The impartiality of Juror 105 was shown through his statements that "he had not yet made up his mind in the case (nor would he until hearing the facts and the law)," that he "understood the court's unambiguous admonishment that the State, and not the defendant, bore the burden of proof . . . [and] expressly acknowledged understanding that the

burden of proof was on the State and that he would consider all sentencing options and follow the court's instructions." *Id.* at 599. These aspects of his service as a juror are matters of historical fact, *Patton v. Yount.* 467 U.S. 1025, 1036 (1984), the inquiry made of him was sufficient to determine whether he was harboring bias, *see Morgan*, 504 U.S. at 735, and Ward has not rebutted the presumption of correctness applicable to such facts by clear and convincing evidence. 28 U.S.C. § 2254(e) (1); *Burt v. Titlow,* 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen,* 558 U.S. 290, 293 (2010)). These facts, show, moreover, that Juror 105 could "conscientiously and properly carry out [his] sworn duty to apply the law to the facts of [the] case." *Ross v. Oklahoma,* 487 U.S. 81, 86 (1988). Juror 105 thus was an impartial juror as required by the Sixth Amendment and the Due Process Clause, and for this reason Ward is not entitled to habeas relief based on this claim.

### D. Claim VI—Indiana's Statutory Mutilation Aggravating Factor is Unconstitutionally Overbroad

One of the three statutory aggravators alleged by the State of Indiana in seeking the death penalty was that Stacy Payne was mutilated or tortured while still alive. Ward claims that this statutory aggravating factor is unconstitutionally vague and overbroad. The statute expresses this aggravating circumstance as follows: "The defendant burned, mutilated, or tortured the victim while the victim was alive." IND. CODE § 35–50–2–9(b)(11).

In *Godfrey v. Georgia,* the Supreme Court considered an aggravating circumstance instruction that allowed for the death penalty if the jury found that the murder was "'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.'" 446 U.S. 420, 422 (1980) (quoting a Georgia statute). The Court held that the instruction was unconstitutional as applied in that case because it resulted in

"standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Id.* at 429. The Court further held that the Georgia Supreme Court failed to cure the defect because it did not apply a constitutional construction of the statutory language in affirming the death sentences on appeal. *Id.* at 432–33. In contrast, an aggravating factor withstands a constitutional challenge if it has some "common sense core of meaning . . . that criminal juries should be capable of understanding." *Tuilaepa v. California,* 512 U.S. 967, 973–74 (1994)(quoting *Jurek v. Texas,* 428 U.S. 262, 279 (1976)). However, to be constitutional, an aggravating circumstance must "not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa,* 512 U.S. at 972. In determining whether an aggravating factor is constitutional, the Supreme Court has looked at the way the factor was defined. *See, e.g., Godfrey,* 446 U.S. at 431–33.

In this case, the jury was charged with determining whether the State had proven beyond a reasonable doubt that Ward "tortured the victim while the victim was still alive and/or the [d]efendant mutilated the victim while the victim was still live." (PCR. App. at 1001). Ward's jury was instructed as follows regarding the meaning of the terms "torture" and "mutilation":

> Torture is an appreciable period of pain or punishment intentionally inflicted and designed either to coerce the victim or for the torturer's sadistic indulgence. Put another way, torture is the gratuitous infliction of substantial pain or suffering in excess of that associated with the commission of the charged crime.
>
> Mutilation means to cut off or permanently destroy an essential part of a body or to cut up or alter radically so as to make imperfect. In order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim that goes beyond the act of killing.

(PCR. App. at 1004–05; Final Instructions No. 21 and 26).

This same definition of mutilation was found constitutional when reviewing language of a Nevada statute in *Ybarra v. McDaniel*, 656 F.3d 984, 995-96 (9th Cir. 2011)(citing *Deutscher v.*

*Whitley,* 884 F.2d 1152, 1162 (9th Cir. 1989), *vacated on other grounds sub nom. Angelone v. Deutscher,* 500 U.S. 901 (1991)).

> As to the other feature of this claim, a state wishing to authorize capital punishment
>
> has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates Åstandardless [sentencing] discretion.@

*Godfrey v. Georgia,* 446 U.S. 420, 428 (1980) (quoting *Gregg v. Georgia,* 428 U.S. 153, 196 n.47 (1976)). One way in which this may be done is by a state legislature broadly defining capital offenses, but providing for narrowing by jury findings of aggravating circumstances at the penalty phase. *Lowenfield v. Phelps,* 484 U.S. 231, 246 (1988). This is the route the State of Indiana has followed. The jury instructions in Ward's case cured any overbreadth problem because they "genuinely narrow[ed] the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 877 (1983).

The Indiana Supreme Court held that Indiana's statutory terminology, together with the definitions provided to the jury in the instructions just referenced, were sufficient to meet a vagueness challenge and that the content of the aggravating factors alleged in Ward's case adequately was indicative of appreciably greater culpability and thereby narrowed the class of death eligible murder. *Ward II,* 803 N.E.2d at 961 (citing *Baird v. State,* 604 N.E.2d 1170, 1183 (Ind. 1992), *cert. denied,* 510 U.S. 893 (1993)). In doing so, the Indiana Supreme Court reasonably applied the standards established in *Godfrey* and *Tuilaepa.* Because this decision was reasonable, "it cannot be disturbed." *Hardy v. Cross*, 132 S. Ct. 490, 495 (2011) (per curiam).

### E. Claim VII—Insufficient Evidence of Torture and Mutilation

Ward asserts that the evidence in this case fails to show torture and mutilation as required to trigger the aggravating factor specified in IND. CODE § 35–50–2–9(b)(11).

"It has long been established that the Constitution 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Crayton v. United States*, 2015 WL 3895767, at *4 (7th Cir. June 25, 2015)(quoting *In re Winship,* 397 U.S. 358, 364 (1970)).

> The standard of review is a rigorous one: evidence, viewed in the light most favorable to the State, is sufficient to support a conviction so long as any rational trier of fact could find the essential elements of the offense to have been proved beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). Because we consider this claim on collateral review rather than direct appeal, [AEDPA] imposes an additional layer of defense onto this inquiry: we may grant relief on this claim only if the [State] Appellate Court applied the *Jackson* standard unreasonably to the facts of [the] case.

*Jones v. Butler,* 778 F.3d 575, 581–82 (7th Cir. 2015) (parallel citations omitted). In other words, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011).

The Indiana Supreme Court announced its *Jackson*-compatible standard of review—"[i]n view of this evidence, a reasonable jury could find torture and mutilation beyond a reasonable doubt," *Ward II,* 903 N.E.2d at 962—after having given this analysis of the evidence:

> While acknowledging that he pleaded guilty to raping and murdering the victim, the defendant argues that no evidence showed that he tortured the victim to coerce sexual intercourse, that he intentionally inflicted an appreciable period of pain or punishment on her, or that her injuries went beyond those attendant to the act of killing.

> We view the evidence differently and, indeed, find that the evidence of torture and mutilation was overwhelming. The victim's young sister, who called 911 during the attack, testified that she observed the defendant on top of the victim as the victim screamed and pleaded with the attacker to "please stop, please stop," to which he responded, "you better be quiet." Tr. at 1271.

> Law enforcement officers found the victim naked from the waist down, with her abdominal contents outside her body, flailing her arms and legs and trying to speak. The defendant had slashed the victim's throat, severing her windpipe and right internal jugular vein, and had cut open her abdomen with a twenty-four inch long slash around her waist. This wound exposed the victim's backbone. One doctor

30

concluded from these injuries that the defendant had cut through the front of her abdomen and driven the knife all the way through her midsection and into her spine. The victim remained alive during this attack, during the on-the-scene EMT care, and during her transport to and care at the local hospital, where she squeezed the hand of an emergency room nurse when asked if she could understand. The autopsy also revealed that she had sustained eighteen blunt force injuries and ligature marks on her left shin and right forearm. In view of this evidence, a reasonable jury could find torture and mutilation beyond a reasonable doubt.

*Id.*

This analysis was an entirely reasonable application of the federal *Jackson* standard. *Monroe v. Davis,* 712 F.3d 1106, 1120 (7th Cir. 2013). It shows that the Indiana Supreme Court "provided fair process and engaged in reasoned, good-faith decision-making when applying *Jackson's* 'no rational trier of fact' test." *Gomez v. Acevedo,* 106 F.3d 192, 199 (7th Cir. 1997), *vacated on other grounds, Gomez v. DeTella,* 522 U.S. 801 (1997). This determination that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found could find torture and mutilation beyond a reasonable doubt, did not run afoul of the AEDPA standard as expressed in 28 U.S.C. § 2254(d)(1), and hence Ward is not entitled to relief based on this claim.

### F. Claim VIII--Indiana's Death Penalty Statute is Unconstitutional

Ward alleges that Indiana's death penalty statute is constitutionally infirm because it fails to require the jury's relative weighing of aggravating and mitigating circumstances be found beyond a reasonable doubt. Ward argues that this situation violates principles established in *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey,* 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Blakely v. Washington,* 542 U.S 296 (2004).

The Indiana Supreme Court rejected this claim on the basis of decisions in its prior cases. *Ward II,* 969 N.E.2d at 950. This outcome was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court.

31

*Yarborough v. Alvarado*, 541 U.S. 652, 664, (2004)(a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. The Supreme Court has "'never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" *Kansas v. Marsh,* 548 U.S. 163, 175 (2006)(quoting *Franklin v. Lynaugh,* 487 U.S. 164, 179 (1988)). None of the decisions relied upon by Ward support his argument that Indiana's statute is constitutionally unsound because the jury is not required to use a "beyond a reasonable doubt" standard when weighing aggravating and mitigating circumstances, and none requires the outcome he condemns as absent from his trial. *Matthews v. Workman,* 577 F.3d 1175, 1195 (10th Cir. 2009); *Overstreet v. Superintendent*, 2011 WL 836800, at *39 (N.D. Ind. Mar. 4, 2011) ("In sum, nothing in *Jones, Apprendi,* or *Ring* supports the proposition that the process of weighing aggravators and mitigators is a fact that must be determined by a jury beyond a reasonable doubt. Rather, weighing is a process of comparing aggravators to mitigators."), *aff'd sub nom. Overstreet v. Wilson*, 686 F.3d 404 (7th Cir. 2012). Even with the addition of Life Without Parole in the array of possible capital sentences in Indiana, Ward has not established that he was the victim of an unconstitutionally "wanton" or "freakish" imposition of the death penalty. *See Furman v. Georgia,* 408 U.S. 238, 310 (1972) (Stewart, J., concurring).

Ward's second argument is that Indiana's death penalty statute violates the Eighth and Fourteenth Amendments because the aggravators under the Indiana statute do not serve the constitutionally required minimal function of distinguishing between those murders for which an individual should be subject to life without parole or death. This argument was presented in Ward's appeal from the denial of his petition for post-conviction relief, but the Indiana Supreme Court found that challenge to be without merit. *Ward III*, 969 N.E.2d at 80-84.

The constitutionally adequate narrowing function occurs in Indiana at the sentencing phase, not at the guilt phase through application of legislative nuances. *See Proffitt v. Florida,* 428 U.S. 242, 247–50 (1976)("The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in decided whether the death penalty is to be imposed."). The Indiana Supreme Court had explained this in an earlier case:

> Even with the addition of life without parole as an alternative punishment for death-eligible murderers, however, the Indiana system "rationally distinguishes between those individuals for whom death is an appropriate sanction and those for whom it is not." *Stevens v. State,* 691 N.E.2d 412, 429 (Ind.1997) (quoting *Spaziano v. Florida,* 468 U.S. 447, 460, 104 S. Ct. 3154, 3162, 82 L.Ed.2d 340, 352 (1984)). Just as there is no constitutional defect under the Indiana death penalty statute, which gives the Indiana sentencer discretion to choose between death and imprisonment for a term of years, so also there is no defect in permitting the sentencer to choose the alternative of life imprisonment without parole. *Wrinkles,* 690 N.E.2d at 1165.

*Corcoran v. State*, 739 N.E.2d 649, 653 (Ind. 2000).

The foregoing assessment of the Indiana death penalty statute by the Indiana courts was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court.

### G. Claim IX—Admission of Gruesome Photographs

Ward contends that the admission of photographs of Stacy's body at trial violated his rights under the Fifth and Fourteenth Amendments. The Indiana Supreme Court discussed the admission of these photographs:

> Each of the four pictures is gruesome, but each was accompanied by the testimony of the forensic pathologist explaining the nature of the medical procedures performed on the victim and describing the relevance of each photograph. As in *Fentress[ v. State*, 702 N.E.2d 721 (Ind. 1998)], this testimony

served to mitigate the jury's drawing an impermissible inference that the defendant bore responsibility for the autopsy incisions. Further, notwithstanding the fact that guilt was established by the defendant's guilty pleas, these photographs remained probative and relevant to the mutilation and torture charged as aggravating circumstances. Proving the nature and extent of a gruesome crime usually requires gruesome evidence. The challenged photographs were relevant, and their probative value outweighed their potential prejudice. The trial court did not abuse its discretion by admitting these photographs into evidence.

*Ward II*, 903 N.E.2d at 958-59.

As a question of state law, which is how this claim was presented to the Indiana Court of Appeals, the claim is not cognizable under § 2254(a). As the Supreme Court has stated, "federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke,* 131 S. Ct. 859, 861 (2011) (citing *Estelle v. McGuire,* 502 U.S. 62, 67 (1991)).

There is no indication that the Indiana Supreme Court considered the due process argument Ward presented to it. Accordingly, its decision that the trial court had not abused its discretion by admitting the photographs into evidence is not entitled to AEDPA deference. *Morales v. Boatwright*, 580 F.3d 653, 663 n.8 (7th Cir. 2009). "Where the state courts did not reach a federal constitutional issue, 'the claim is reviewed *de novo.*'" *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012)(quoting *Cone v. Bell,* 556 U.S. 449, 472 (2009)). This means that the claim is reviewed under the pre-AEDPA standard of 28 U.S.C. § 2243, pursuant to which the court is to "dispose of the matter as law and justice require." *Id.*

This claim is a due process challenge to the admission of evidence. *See Bigby v. Dretke,* 402 F.3d 551, 563 (5th Cir. 2005) (holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated federal constitutional protections).

The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States,* 493 U.S. 342, 352 (1990). State court evidentiary rulings only implicate the Due Process Clause when "evidence 'is so extremely unfair

34

that its admission violates fundamental conceptions of justice[.]'" *Perry v. New Hampshire,* 132 S. Ct. 716, 723 (2012)(quoting *Dowling,* 493 U.S. at 352). A proceeding is fundamentally unfair under the Due Process Clause only if it is "shocking to the universal sense of justice." *United States v. Tome,* 3 F.3d 342, 353 (10th Cir. 1993) (quoting *United States v. Russell,* 411 U.S. 423, 432 (1973) (internal quotation omitted)), *rev'd,* 513 U .S. 150 (1995). "Gruesome crimes result in gruesome photographs." *State v. Green,* 274 Kan. 145, 148 (2002).

> Moreover, the importance of reliable, informed decisionmaking actually counsels in favor of admitting evidence of the double homicide, notwithstanding its grisly nature. The Supreme Court has emphasized that the jury should receive as much information as possible when it makes the sentencing decision, and that there is an "acute need for reliable decisionmaking when the death penalty is at issue.

*United States v. Lujan,* 603 F.3d 850, 859 (10th Cir. 2010)(internal quotations and citations omitted).

Ward's claim falls short. The Indiana Supreme Court was correct in concluding that the photographs were relevant and that their probative value outweighed their potential prejudice. These photographs had particular probative value in light of the aggravating factors alleged by the State. The admission of these photographs was not unfairly prejudicial and is not shocking to a universal sense of justice. The penalty phase of Ward's trial was not rendered fundamentally unfair because of that admission. He is not entitled to habeas corpus relief based on this claim.

### H. Claim X—*Napue* Claim

Ward's final claim is that the prosecutor elicited false testimony regarding the existence of a putt-putt golf course on the grounds of the Indiana State Prison and that he is entitled to relief under *Napue v. Illinois*, 360 U.S. 264 (1959).[1]

---

[1] As noted by the Indiana Supreme Court: "The thrust of the claim here is that counsel allowed the prosecutor to suggest that Ward was enjoying life in prison playing putt-putt when in fact there was no putt-putt course at the prison at all. *Ward IV*, 969 N.E.2d at 75.

The Indiana Supreme Court addressed this claim in the following terms:

> Finally, Ward makes a claim under *Napue v. Illinois,* 360 U.S. 264, 79 S. Ct. 1173, 3 L.Ed.2d 1217 (1959), regarding the prosecutor's use of false testimony. Specifically, Ward argues that the prosecutor used testimony about the existence of a putt-putt golf course at the Indiana State Prison that the prosecutor knew or should have known to be false and that the testimony may have had an effect on the outcome of the trial. The PC court rejected this claim.
>
> Initially, the [post-conviction] court concluded that this claim was waived because it was available for direct appeal but not raised. PCR App. 362. It found that trial counsel Youngcourt had "testified at post-conviction that she 'knew more about the Indiana State Prison' than the prosecutor ever could" and that she had been going to the prison for 16–17 years. *Id.*
>
> Nevertheless, the PC court concluded that the claim was without merit. It concluded that because "[f]undamental error is not available on post-conviction review," *id.* (citing *Sanders v. State,* 765 N.E.2d 591, 592 (Ind. 2002)), "the only procedurally available posture in which to litigate these alleged instances of prosecutorial misconduct on post-conviction review is to show that trial and/or appellate counsel were ineffective in responding to them," *id.* It then analyzed the claim under the traditional prosecutorial misconduct standard that considers whether the prosecutor engaged in misconduct and whether that misconduct placed Ward in grave peril and concluded that the claim failed.
>
> Even if we were to conclude that the testimony elicited by the State concerning the putt-putt golf course constituted "false testimony" within the meaning of *Napue,* we agree with the PC court that the issue could have been raised on direct appeal and, consequently, is not available here. *See Pruitt,* 903 N.E.2d at 905 (issues available but not raised on direct appeal are waived).

*Ward III,* 969 N.E.2d at 84-85.

Thus, the Indiana Supreme Court found that Ward's *Napue* claim was waived. The rule

invoked in this finding is the following:

> A post-conviction relief proceeding is not a substitute for trial and appeal, but is a process for raising issues that were unknown or not available at trial. *Davidson v. State,* 763 N.E.2d 441, 443 (Ind. 2002). If an issue was available on direct appeal but not litigated, it is deemed waived. *Madden v. State,* 656 N.E.2d 524, 526 (Ind.Ct.App. 1995).

*Conner v. Anderson*, 259 F.Supp.2d 741, 750 (S.D.Ind. 2003)(quoting *Smith v. State,* 774 N.E.2d

1021, 1022 (Ind.Ct.App. 2002)), aff'd, 375 F.3d 643 (7th Cir. 2004).

This is a finding of procedural default. In consequence, this court cannot reach the merits of the claim unless Ward demonstrates either (a) cause for the default and prejudice or (b) that failure to consider his claim would result in a fundamental miscarriage of justice (*i.e.*, a claim of actual innocence. *Conner v. McBride,* 375 F.3d 643, 648 (7th Cir. 2004) (internal citations omitted). Apart from the issue of procedural default, moreover, the claim lacks merit.

Under *Napue,* it is unconstitutional for the state to knowingly use false or perjured testimony against a defendant to obtain a conviction. *Id.* "A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976) (footnote omitted). To establish the right to a new trial, a defendant must establish: "(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury." *United States v. Freeman,* 650 F.3d 673, 678 (7th Cir. 2011) (citing *Napue,* 360 U.S. at 269).

The Indiana Supreme Court considered the basis for Ward's *Napue* claim when evaluating one specification of his ineffective assistance of counsel claim. *See Campbell v. Smith,* 770 F.3d 540, 547 (7th Cir. 2014) (addressing ineffective assistance of counsel claim based on an embedded constitutional issue). In doing so, the Indiana Supreme Court cited and agreed with a portion of the trial court's findings in the action for post-conviction relief:

> Regardless, the Court finds that had Ward's counsel made an effort to disabuse the jury regarding the availability of miniature golf to inmates, such would not have created any probability, let alone a reasonable one, of a different outcome.

> We agree.

*Ward III*, 969 N.E.2d at 75 (omitting citation to the post-conviction record). This is a finding that the third element of a *Napue* claim is absent, and under all the circumstances it is a reasonable

finding. *Agurs,* 427 U.S. at 103 (a *Napue* violation is material when there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury"); *Smith v. Phillips,* 455 U.S. 209, 220 n.10 (1982)(it is the "misconduct's effect on the trial, not the blameworthiness of the prosecutor, [which] is the crucial inquiry for due process purposes." *Phillips,* supra at 220 n. 10. As such, even if Ward could overcome his procedural default, he is not entitled to habeas corpus relief on this claim.

### V. Conclusion

"[I]n all habeas corpus proceedings under 28 U.S.C. § 2254, the successful petitioner must demonstrate that he 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Brown v. Watters,* 599 F.3d 602, 611 (7th Cir. 2010) (quoting 28 U.S.C. § 2254(a)). Ward's conviction and sentence withstood challenge in the Indiana courts, and thus a presumption of constitutional regularity attaches to it. *See Farmer v. Litscher,* 303 F.3d 840, 845 (7th Cir. 2002) (citing *Parke v. Raley,* 506 U.S. 20, 29-30 (1992)); *Milone v. Camp,* 22 F.3d 693, 698-99 (7th Cir. 1994) ("Federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law").[2] As the foregoing discussion demonstrates, this court's view is that he received all that the Constitution requires.

> For a trial to be constitutionally sound requires . . . a trial where the prosecutor must prove all elements of a crime beyond a reasonable doubt in order to convict; where the prosecutor adheres to certain rules of conduct that guarantee a fair trial and a proper consideration of the defendant's theories and supporting evidence; where the jurors consider only evidence adduced by the parties and that a defendant has had an opportunity to rebut; and where a defendant enjoys the right to cross-examine adverse witnesses.

*Gall v. Parker,* 231 F.3d 265, 277-78 (6th Cir. 2000).

---

[2]Obviously, this is not a presumption related to the AEDPA, but is "the 'presumption of regularity' that attaches to final judgments, even when the question is waiver of constitutional rights." *Parke v. Raley,* 506 U.S. at 29 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464, 468 (1938)).

The Supreme Court has explained that "a federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett,* 559 U.S. 766, 773 (2010)(quoting *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997); *Woodford v. Viscotti,* 537 U.S. 19, 24 (2002) (*per curiam*)). This court has carefully reviewed the state record in light of Ward's claims and has given such consideration to those claims as the limited scope of its review in a habeas corpus proceeding permits. The deference due to state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington,* 562 U.S. at 102. Ward's habeas petition does not present such a situation.

Ward's petition for a writ of habeas corpus is therefore **denied.**

Judgment consistent with this Entry shall now issue.

Ward shall have thirty (30) days from the issuance of this Entry in which to seek a certificate of appealability.

IT IS SO ORDERED.


Date: ___9/22/2015___


                                                RICHARD L. YOUNG,  CHIEF JUDGE
                                                United States District Court
                                                Southern District of Indiana


Distribution:

Electronically Registered Counsel